UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
DEBORAH FEINGOLD D/B/A
DEBORAH FEINGOLD PHOTOGRAPHY          Case No.: 1:18-cv-2055(KMW)(GWG)

                    Plaintiff,

        -against-

RAGEON, INC., JOHN DOES 1-4,

                    Defendants.
-----------------------------------------------------x


**PLAINTIFF DEBORAH FEINGOLD's**
**(D/B/A DEBORAH FEINGOLD PHOTOGRAPHY)**
**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S**
**SUPPLEMENTAL REQUEST FOR DAMAGES, ATTORNEYS' FEES, AND COSTS**


**GARSON, SÉGAL, STEINMETZ, FLADGATE LLP**
Chris Fladgate
164 West 25th Street, Suite 11R
New York, New York 10001
Tel: (212) 380-3623
Fax: (347) 537-4540
cf@gs2law.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................. 1

II.    PRELIMINARY STATEMENT .......................................................................... 1

III.   STATUTORY DAMAGES .................................................................................. 2

       A.     The infringer's state of mind................................................................... 2

       B.     The expenses saved, and profits earned by the infringer ..................... 4

       C.     The revenue lost by the copyright holder .............................................. 5

       D.     The deterrent effect on the infringer and third parties ....................... 9

       E.     The infringer's cooperation in providing evidence concerning the value of the
              infringing material ................................................................................. 10

              i.     *Reeves Photograph* ................................................................... 10

              ii.    *Madonna Photograph* ............................................................... 10

       F.     The conduct and attitude of the parties ............................................... 14

              i.     *The conduct and attitude of Defendant* ................................... 14

                     a.     *Pre-litigation conduct of Defendant* ........................... 14

                     b.     *Post-commencement of litigation conduct by Defendant*........... 14

                     c.     *The Defendant's deposition* ......................................... 19

              ii.    *The conduct and attitude of Plaintiff* ...................................... 19

IV.    DAMAGES FOR WILLFUL INFRINGEMENT ......................................... 20

V.     PLAINTIFF'S ATTORNEYS' FEES AND COSTS ................................... 22

VI.    CONCLUSION................................................................................................... 25

## Table of Authorities

*Agence Fr. Presse v. Morel*
    934 F. Supp. 2d 547 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Bryant v. Media Rights Prods*.
    603 F.3d 135 (2d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 20

*Erickson Prods. v. Only Websites, Inc.*
    2015 U.S. Dist. LEXIS 177371 (S.D.N.Y. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Fogerty v. Fantasy, Inc.*
    510 U.S. 517 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Getty Petroleum Corp. v. Barco Petroleum Corp*.
    858 F.2de 103 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*HarperCollins Publrs. LLC v. Open Rd. Integrated Media, LLP*
    58 F. Supp. 3d 380 (S.D.N.Y. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Kirtsaeng v. John Wiley & Sons, Inc.,*
    136 S. Ct. 1979 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

*Psihoyos v. John Wiley & Sons, Inc.*
    748 F.3d 120 (2d Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Tiffany & Co. v. Costco Wholesale Corp.*
    2019 U.S. Dist. LEXIS 2844 (S.D.N.Y. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .22

## Statutes

17 U.S.C. § 504(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 20

17 U.S.C. §505 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

## I.     INTRODUCTION

Pursuant to the Court's invitation (Dkt. # 153, 14), Plaintiff, Deborah Feingold d/b/a Deborah Feingold Photography ("Plaintiff"), by and through the undersigned counsel, respectfully submits this Supplemental Memorandum of Law (*"Supplemental Memorandum"*), the Declaration of Deborah Feingold ("*Feingold Dec.*"), the Declaration of Robert Garson (*"Garson Dec."*), and the Declaration of Chris Fladgate ("*Fladgate Dec."*), in support of Plaintiff's Supplemental Request for Damages, Attorneys' Fees, and Costs ("Supplemental Request").

## II.    PRELIMINARY STATEMENT

If Defendant had simply honored the first communication it made to Plaintiff's counsel – to remove infringing materials from its website in approximately 24 hours – this matter would have never commenced.

Or, of Defendant had been honest about making sales of the infringing materials, it is unlikely this matter would remain before the Court.

But, Defendant elected to do neither.

So, Plaintiff, having obtained summary judgment in this matter on July 15, 2020 in relation to Defendant's copyright infringements, located at multiple locations on Defendant's website ("Vendor URLs"), of Plaintiff's photographs of Madonna ("Madonna Photograph") and Keanu Reeves ("Reeves Photograph" which, together with the Madonna Photograph, are collectively "Photographs") (Dkt. # 153) ("Summary Judgment Order"), makes this Supplemental Request.

Plaintiff has elected to recover statutory damages. (Dkt. # 153, 13) For the reasons set forth below, the facts of the case – particularly Defendant's egregious and deceitful behavior – support a finding of willful infringement pursuant to 17 U.S.C. § 504(c)(2).

1

Under the applicable standards, Plaintiff is entitled to damages in the amount of:

(a)        $150,000 for Defendant's infringement of the Madonna Photograph; and

(b)        $50,000 for Defendant's infringement of the Reeves Photograph.

Additionally, Plaintiff is entitled to an award of attorneys' fees in the amount of $116,676.00.

Additionally, Plaintiff is entitled to an award of costs in the amount of $3,055.77.

## III.    STATUTORY DAMAGES

As set forth by this Court, in determining just damages pursuant to 17 U.S.C. § 504(c)(2) courts in this district are guided by factors including:

> … (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties. *Bryant v. Media Right Productions, Inc.,* 603 F.3d 135, 144 (2d Cir. 2010). (Dkt. # 153, 13)

Accordingly, the above criteria is analyzed below in relation to this matter.

## A.    The infringer's state of mind

In order to consider "the infringer's state of mind," courts will look to factors including:

> 'whether the infringer was on notice that the copyrighted work was protected; whether the infringer had received warnings of the infringements; [and] whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent. *Agence Fr. Presse v. Morel*, 934 F. Supp. 2d 547, 570 (S.D.N.Y. 2013).

In short, Defendant ticks all of the above boxes as, and taking the above criteria in reverse:

(a)        Defendant cannot assert ignorance of copyright. Defendant works in an industry where copyright is prevalent. Indeed, infringer makes multiple representations on its website (and has done so for years) that it protects and safeguards intellectual property; (Dkt. 125, ¶¶ 160-161; Dkt. # 125-35; Dkt. # 125-36; Dkt. # 125-37)

(b)        Defendant has been the named defendant in multiple copyright and trademark

2

infringement matters, both before and after the commencement of this matter. Indeed, earlier this year in this district, Defendant was found to have willfully infringed a registered copyright; (Dkt. # 124, 25; *Fladgate Dec.*, ¶¶ 6-13)

(c)     Defendant received multiple warnings of infringement from Plaintiff; (Dkt. # 124, 26; Dkt. # 125, ¶¶ 54, 104; Dkt. # 125- 13; Dkt. # 125-31) and

(d)     Accordingly, Defendant was on notice that the Photographs were both copyrighted and protected.

As such, Defendant's state of mind shows a callous disregard to the rights of copyright owners. Moreover, this blatant disregard stands in stark contrast to its various boasts on its website about being a safe harbor for intellectual property holders. (Dkt. 125, ¶¶ 160-161; Dkt. # 125-35; Dkt. # 125-36; Dkt. # 125-37)

From the time Defendant received the first DMCA takedown notices in this matter, it actively sought to deny any liability, falsely claimed the infringing items had been removed, brazenly lied by claiming that no sales were made, and produced false documents to support the foregoing deceit.

Additionally, at seemingly every point, Defendant sought to delay the progress of what should ordinarily be a routine copyright litigation.

Defendant openly represented on its website that it protected and safeguarded intellectual property rights. (Dkt. 125, ¶¶ 160-161; Dkt. # 125-35; Dkt. # 125-36; Dkt. # 125-37) As this case demonstrates, nothing could be further from the truth.

Accordingly, we submit that Defendant's state of mind was such that it supports a heightened award of damages.

**B.      The expenses saved, and profits earned by the infringer**

The expenses saved by Defendant are equal to the licensing fees and/or royalties that did not have to be paid to Plaintiff.

In relation to this element of damages, Plaintiff has been deprived of four licensing fees (three in relation to the Madonna Photograph, being one from each infringing vendor, and one in relation to the Reeves Photograph). (*Feingold Dec.*, ¶¶ 16-20) In other words, Plaintiff has been denied the opportunity to receive a license fee calculated on a per user basis. This is analogous to how software companies licensing products on a per user (or "per seat") basis. See, for example, https://acrobat.adobe.com/us/en/sign/pricing/plans.html.

In relation to the profits earned by Defendant, we simply don't know the answer to that question because Defendant (a) refused to produce any meaningful documents in discovery, and (b) the documents Defendant did produce cannot be relied on for the reasons set forth below.

For the Madonna Photograph, Defendant maintained for almost 18 months that no sales were made. (Dkt. # 124, 21-22; Dkt. # 125, ¶¶ 68, 88-91, 93-95, 97, 99-102; Dkt. # 125-2, 18:22-19:11, 35:17-36:9, 180:4-181:9, 190:24-191:7, 194:13-195:8; Dkt. # 125-16; Dkt. # 125-24; Dkt. # 125-25; Dkt. # 125-26; Dkt. # 125-27; Dkt. # 125-28; Dkt. # 125-29, # 4, # 5, # 9, # 10, # 15, # 17, # 19; Dkt. # 125-30; Dkt. # 12, ¶¶ 80-83, 85) Then, in June 2018, in order to try to avoid its deposition and stay the case, Defendant claimed that "sales barely exceeds $200." (Dkt. # 91; *Fladgate Dec.* ¶ 58)

Defendant's former counsel also represented in January 2019 that all purported sales had been subsequently cancelled and then produced a document purporting to show such cancelled sales. (Dkt. # 125, ¶ 89; Dkt. # 125-25, 2, 6-8; *Fladgate Dec.* ¶ 39, Ex. E) However, such cancelled sales were then included in Defendant's list of final sales. (Dkt. # 125, ¶¶ 89-91; Dkt. # 125-25; Dkt. #

4

125-26; Dkt. # 125-27; Dkt. # 125-28; *Fladgate Dec.* ¶ 40) So, in short, we do not know what profits Defendant made from the Madonna Photograph because none of the documents produced by Defendant can be relied on. Moreover, in the Defendant's Objections and Responses to Plaintiff's Requests for Admission (Dkt. # 125-3) ("RFA Responses"), Defendant admits that it does not know how many sales were made. (Dkt. # 125-3, # 70, # 71)

In relation to the Reeves Photograph, no documents were produced, so we have absolutely no idea as to profits made. As stated, in the RFA Responses Defendant admits that it does not know how many sales were made. (Dkt. # 125-3, # 70, # 71)

Accordingly, Defendant should not be permitted to benefit from its poor behavior in relation to either its poor record retention and or its discovery obligations. As such, we submit that the Court adopt the license fees saved by Defendant (that Plaintiff has been deprived) as the basis for calculating damages.

## C.      The revenue lost by the copyright holder

The revenue lost for Plaintiff can be measured through lost licensing fees and this is the same analysis as the expenses saved by Defendant (i.e., the cost of a master license fee).

There is some complexity in then determining the amount of each license because Plaintiff does not permit her photographs to be licensed for merchandising purposes. (Dkt. # 127, ¶¶ 15-16, 58-61; *Feingold Dec.*, ¶¶ 12-20) Moreover, there is no legal basis upon which Defendant could force her to do so. So, in the first instance, Plaintiff would refuse to countenance such a licensing arrangement. However, adopting the cliché "that every person has their price," common sense dictates that where a person is reluctant to permit use of their property, then they place a premium, or a higher price, on the use of that property. This is broadly analogous to why, in certain professions and industries, employees receive a higher hourly wage on public holidays, weekends,

and for overtime, because there is a fundamental acknowledgement that the employee, ideally, does not want to work on Thanksgiving and, so, is given additional compensation for doing exactly the same job on that day. While the foregoing example relates to time, we submit it also applies to this matter.

Accordingly, let's examine each of the photographs.

The Madonna Photograph comes from one of Plaintiff's most, if not the most, famous shoots. (*Feingold Dec.*, ¶ 5) The photograph was taken in 1982, months before Madonna's debut self-titled album was released in July 1983 (*Feingold Dec.*, ¶¶ 6-9), which led to Madonna becoming a household name across both the United States and the world. As such, the photograph is rare because there are so few photographs of Madonna taken prior to 1983. (*Feingold Dec.*, ¶ 9) An analogy would be to how rookie cards from famous major league baseball players routinely fetch more at auction than non-rookie cards of the same player.

Moreover, the photograph captures one of Madonna's iconic looks and is instantly recognizable today. (*Feingold Dec.*, ¶¶ 8-9) The photograph captures Madonna: (a) wearing a multitude of "jelly" bracelets, which became synonymous with Madonna's "look" for the 1980s; (b) the crucifix earring which, while shown only in profile in this photograph, featured prominently in both other photographs from the same shoot and Madonna's brand-identity over the next decade; (c) Madonna's hair is dyed with peroxide and styled; and (d) it features her beauty spot above the right-side of her lips. All of the foregoing, collectively, mean that the Madonna Photograph captured the classic Madonna look of the early-to-mid 1980s and explain why photographs from that shoot remain so popular today.

Additionally, Madonna herself, imitated the look captured by the Madonna photograph on the cover of her debut 1983 album. (*Feingold Dec.*, ¶ 9)

 

As with the Madonna Photograph, the Madonna album cover shows: (a) many jelly bracelets; (b) peroxide dyed and styled blonde hair; and (c) the beauty spot. But, as noted in the *Feingold Dec.*, the Madonna Photograph, while similar to the album cover, also shows a more "raw" and naïve, or authentic,98 version of Madonna when compared to the stylized and "slicked-up" version of Madonna on the album cover. (*Feingold Dec.*, ¶¶ 8-9)

Moreover, Plaintiff's photographs from the same photographic shoot have been regularly featured in the mainstream media. For example, one was featured prominently in New York Magazine's feature of Madonna in "The Artist Is Ever Present" (see, https://nymag.com/news/intelligencer/topic/madonna-2013-10/).1 Accordingly, photographs from the Madonna shoot have always been highly sought after and among the most popular of Plaintiff's photographs both in terms of sales and licensing. (Dkt. # 127, ¶¶ 45-46; *Feingold Dec.*, ¶ 5) The popularity of the Madonna Photograph is also *prima facie* shown by three of Defendant's vendors independently using it to sell goods.

Accordingly, the Madonna photograph is extremely valuable to Plaintiff. (Dkt. # 127, ¶¶ 45-46; *Feingold Dec.*, ¶ 5) In terms of licensing the Madonna Photograph to Defendant, Plaintiff takes into consideration the fact that, she would not ordinarily license it for Defendant's purposes,

---

1 Last accessed September 3, 2020.

however, the license fee would also need to reflect the fact that Defendant markets itself to the entire world and that its vendors could make an unlimited number of sales. (*Feingold Dec.*, ¶¶ 15-20) As such, Plaintiff feels she has been denied a license of $10,000 per license, or $30,000 in total in relation to the Madonna Photograph. (Dkt. # 150, ¶¶ 19, 61; Dkt. 150-1; *Feingold Dec.*, ¶¶ 12-17, 19-20)

In relation to the Reeves Photograph, as with the Madonna Photograph, it was taken shortly before Reeves became well known internationally. His "breakthrough" movie, *Bill & Ted's Excellent Adventure*, was released on February 17, 1989, just three weeks before the Reeves Photograph was published in *Rolling Stone Magazine* on March 9, 1989 (the Reeves Photograph was taken in 1988). (*Feingold Dec.*, ¶¶ 10-11)

The Reeves Photograph has also held its value over time because, Plaintiff believes, it is a less serious and more playful photograph of Mr. Reeves. (*Feingold Dec.*, ¶ 10) Plaintiff remembers from the photo shoot itself – in Montauk on Long Island – that Mr. Reeves dipped his head into the water of the bay near Montauk in order to wet and slick back his hair. As Plaintiff states "[i]n retrospect, that added a lot to the Reeves Photograph by giving a certain freshness and, also, it became … a somewhat atypical photograph of Mr. Reeves." (*Feingold Dec.*, ¶ 10)

Accordingly, it is an early, and rare, photograph of Mr. Reeves. (*Feingold Dec.*, ¶ 11)

The Reeves Photograph has, over the years, been sold and licensed by Plaintiff on many occasions. (Dkt. # 127, ¶ 54; *Feingold Dec.*, ¶ 5) Accordingly, the Reeves Photograph is valuable to Plaintiff and, using the same analysis as the Madonna Photograph, Plaintiff believes that she has been deprived of a license fee of $10,000 in relation to the Reeves Photograph. (Dkt. # 150, ¶¶ 19, 61; Dkt. 150-1; *Feingold Dec.*, ¶¶ 12-15, 17-20)

**D.      The deterrent effect on the infringer and third parties**

Much of the deterrent effect relating to the infringer (Defendant) and third parties is addressed in the other criteria, but we make the following brief points:

First, as discussed above, Defendant's state of mind was wholly indifferent to the intellectual property rights of Plaintiff, despite being a business based on the intellectual property rights of others, and making a series of false assertions about intellectual property protections and safeguards on its website. (Dkt. 125, ¶¶ 160-161; Dkt. # 125-35; Dkt. # 125-36; Dkt. # 125-37)

Second, as set forth below in more detail, both and in the *Fladgate Dec.*, ¶¶ 14-67, Exs. B, C, D, E, F, G (see also Dkt. # 110, ¶¶ 40-46; Dkt. # 125, ¶¶ 54-122, 144-150; Dkt. ## 151, ¶¶ 20-27), Defendant's conduct in this matter, from the outset, has been to delay the process of the litigation, make threats and generally engage in dilatory tactics. Moreover, Defendant has repeatedly lied and tried to cover its tracks in an effort to either avoid or minimize its liability. (Dkt. # 125, ¶¶ 54-122, 144-150) Not only is this conduct reprehensible, but the effect of such conduct has been to unnecessarily lengthen these proceedings and add to Plaintiff's costs.

Indeed, based on recent events, Plaintiff is concerned that Defendant is setting a pre-text to delay its opposition filings in this matter. (*Garson Dec.*, ¶¶ 8-13; *Fladgate Dec.*, ¶¶ 70-77)

Finally, as set forth in the *Fladgate Dec.*, ¶¶ 5-13 (see also Dkt. # 124, 25), Defendant can now be classified as a serial copyright infringer and, therefore, there is greater impetus to send a strong message to repeat copyright infringers.

Accordingly, a strong message should be sent by this court disapproving of Defendant's conduct so that a deterrent effect is felt, both by Defendant and would-be copycat third parties.

**E.      The infringer's cooperation in providing evidence concerning the value of the infringing material**

Defendant has provided little to no cooperation in relation to providing evidence concerning the value of the infringing material.

i.      *Reeves Photograph*

As discussed above, Defendant has provided no discovery – or any cooperation – concerning the Reeves Photograph. In its Responses to Requests for Admissions, Defendant admits that it does not know either (a) when the Reeves Photograph was displayed on Defendant's website (Dkt. # 125-3, 26, ¶ 47), and (b) whether it received money from sales of the Reeves Photograph. (Dkt. # 125-3, 38, ¶ 71)

No denials. No admissions. Defendant just does not know.

ii.      *Madonna Photograph*

In relation to the Madonna Photograph, Defendant has provided only marginally more cooperation. Defendant's lack of cooperation is spelled out at length in our prior filings (see, for example, Dkt. #125, ¶¶ 63-103). However, to take one example, let's look at Defendant's attitude towards (eventually) admitting that it made sales of the Photographs:

(a)      In February 2018, once Defendant eventually removed the infringing links, it claimed that no sales had been made. (Dkt. # 125, ¶¶ 68, 87; Dkt. # 125-16, 2)

(b)      Defendant did not produce sales and shipping documents relating to the test-buy conducted by Plaintiff's counsel, either in its initial document production, or subsequent to a request at Mr. Krilivsky's deposition to produce these documents. (Dkt. # 125, ¶¶ 75, 92; Dkt. # 125-17, Dkt. # 125-18, Dkt. # 125-20)

(c)      In May 2018, Defendant's first counsel, Mr. Andrew Gerber, affirmatively denied any sales had been made. ((Dkt. # 125, ¶ 88; Dkt. # 125-24, 2)

(d)      On September 22, 2018, Defendant provided a screenshot purporting to show when the various Vendor URLs were deleted. (Dkt. # 125-30; *Fladgate Dec.*, ¶¶ 34-35, Ex. D) As can be seen by the "deleted_at" column, the document contains verifiably false information. Defendant has never provided an explanation as to how the false information came to be included in this document. In the circumstances, we submit that Defendant intentionally included the false information in an effort to evade liability.

(e)      On January 4, 2019, Defendant's second counsel, Mr. Matthew Heerde, provided a document that purported to show that two sales of the Madonna Photograph had been made and subsequently canceled. He further stated, "We are told that this reflects the only sales activity relating to the images at issue." (Dkt. # 125, ¶ 89; Dkt. # 125-25, 2, 6-8; *Fladgate Dec.*, ¶ 39, Ex. E) However, those same sales were later included in Defendant's list of purported sales. (Dkt. 125, ¶¶ 91-92; Dkt. 125-27; *Fladgate Dec.*, ¶¶ 40-41)

(f)      On March 29, 2019, Defendant's third counsel, Ms. Betty Tufariello, served Defendant's Supplemental Responses to Interrogatories in which Defendant denied that any sales had been made. (Dkt, # 125, ¶¶ 93-94; Dkt. #125-1, ¶¶ 15, 17, 19)

(g)      Also, on March 29, 2019, Ms. Tufariello, served Defendant's Supplemental Responses to Plaintiff's Initial Set of Requests for Production, in which Defendant also denied that any sales had been made of the Madonna Photograph. (Dkt, # 125, ¶ 95; Dkt. #125-29, ¶¶ 4, 5, 9, 10)

(h)      Eventually, on March 29, 2019, Defendant produced its first set of documents responsive to discovery requests. This set of documents consisted of 20 pages, 11 of which

were already in Plaintiff's possession. (See Dkt. # 110, ¶¶ 40-46 for a full recapitulation.) All the same, this production included the same screenshot discussed above that purported to show when each of the Vendor URLs were deleted. (Dkt. # 125, ¶¶ 96-97; Dkt. #125-30) Mr. Krilivsky, in his deposition, confirmed that this document was intended to show when the Vendor URLs were deleted. (Dkt. #125-2, 190:24-191:7, 194:13-195:8)

(i)     On June 12, 2019, Ms. Tufariello made reference to "[t]he de minimis sales of any of the allegedly infringing works…" in an email informing Plaintiff's counsel that Mr. Krilivsky would not attend his scheduled deposition. (Dkt. #91-1, 2; *Fladgate Dec.* ¶ 54, Ex. F) This marked the first time that Defendant acknowledged any form of sales of the Madonna and/or Reeves Photographs. Ms. Tufariello also stated that her client was prepared to provide a sworn affidavit in relation to, inter alia, sales of the Madonna and/or Reeves Photograph.[2]

(j)     On June 14, 2019, in a letter to Judge Gorenstein, Ms. Tufariello again admitted that sales of the Madonna and/or the Reeves Photographs had been made and promised that Defendant is "prepared to provide a sworn affidavit" concerning sales. (Dkt. # 91). As discussed below, this admission was motivated by a desperate attempt to prevent Mr. Krilivsky's deposition.

(k)     By email on June 20, 2019, Ms. Tufariello again promised that Mr. Krilivsky would provide a "declaration regarding sales by the end of [June 21, 2019]."

(l)     At approximately 4:27 p.m. on July 2, 2019, (i.e., the day before Mr. Krilivsky's deposition) Defendant's counsel provided its twenty-first page of discovery in this matter which purported to be a list of sales of the Madonna Photograph across each of the three

---

[2] No such statement, sworn or unsworn, was ever provided by Defendant, despite Plaintiff's counsel making repeated requests for it. (Dkt. # 110, ¶ 25; Dkt. # 110-3, 4; Dkt. # 110-9; Dkt. # 110-10)

Vendor URLs selling the Madonna Photograph. (Dkt. # 125, ¶¶ 90-91; Dkt. # 125-26; Dkt. # 125-27; Dkt. # 125-28)

(m)      Finally, at Mr. Krilivsky's deposition on July 3, 2019 did Defendant admit to sales of the Madonna Photograph. (Dkt. # 125, ¶ 99; Dkt. # 125-2, 35:17-36:9) However, this admission was not made in the spirit of full disclosure; rather, it was made because Defendant had deduced that Plaintiff's counsel had made a test-buy from the Vendor URLs selling the Madonna Photograph. (Dkt. # 125, ¶ 100; Dkt. # 125-2, 36:5-7)

In summary, Defendant knew that it had made sales of the Photographs and actively lied about and hid that information from Plaintiff between February 2018 and June 2019. During this period, Defendant made repeated denials about sales, and proffered documents that were either altered or entirely fabricated in order to show either (a) canceled sales, or (b) false dates upon which the Vendor URLs were removed. Then, Defendant only admitted to sales in order to advance its own interests; specifically, in a futile attempt to avoid Mr. Krilivsky being deposed, and then to acknowledge the test buys of Plaintiff's counsel. As Defendant's rationale for seeking to avoid its deposition concerned the alleged *de minimis* amount of sales, we submit that no faith can be placed in Defendant's representation that "sales barely [exceeded] $200.00." (Dkt. # 91, 1) Moreover, the test-buy of infringing products only concerned the Madonna Photograph. As such, it seems suspicious, having discovered that a test buy had occurred, Defendant then only disclosed sales of the Madonna Photograph and made no affirmative statement disclaiming sales of the Reeves Photograph. (For example, see Dkt. 125-3, # 47, # 71)

For the foregoing reasons, the imposition of significant damages will provide an appropriate deterrent both to Defendant and would-be copycat third parties.

**F.      The conduct and attitude of the parties**

This criteria requires an analysis of both Plaintiff and Defendant.

i.      *The conduct and attitude of Defendant*

For the entirety of this litigation Defendant has refused, or only reluctantly and recalcitrantly agreed, to participate in the rudimentary elements of the litigation. We submit that Defendant's conduct is, in turn, demonstrative of its attitude.

a.      Pre-litigation conduct of Defendant

As has been set forth in the Motion for Summary Judgment, at some length, Defendant's first series of communications with Plaintiff's counsel, consisted of misrepresentations and false promises:

   (a)      First, Defendant promised to remove the "infringing content" in approximately 24 hours. (Dkt. # 125, ¶¶ 63, 113; Dkt. # 125-14; Dkt. # 125-32) Defendant did not do this. In truth, had Defendant made good on this representation, then no lawsuit would have been commenced.

   (b)      Then, two weeks later, Defendant represented that the "infringing content" had been taken offline. (Dkt. # 125, ¶¶ 64-65, 114-115; Dkt. # 125-14; Dkt. # 125-32) This representation was false.

   (c)      Then, another two weeks later, Defendant represented that all Vendor URLs had been removed and that "there were no sales made on any of the designs listed." (Dkt. # 125, ¶¶ 68, 87; Dkt. # 125-16, 2) The representation concerning sales was false.

b.      Post-commencement of litigation conduct by Defendant

Plaintiff's counsel, having filed the Complaint (Dkt. # 7) and obtained a summons for service on Defendant (Dkt. # 5) on March 8, 2018, then researched and determined that Defendant is an

Ohio foreign corporation (which Defendant admits) with a place of business in Cleveland, Ohio. Plaintiff's counsel engaged a local process server in Ohio to effect service of the Summons and Complaint. Defendant refused to accept service at its nominated address in Ohio. (*Fladgate Dec.*, ¶¶ 17-18, Ex. A) Accordingly, Plaintiff incurred additional expense attempting to serve Defendant both at its offices in California and via the Delaware Secretary of State. (*Fladgate Dec.*, ¶ 19)

On April 10, 2018, Mr. Krilivsky called Plaintiff's counsel, Chris Fladgate. Mr. Fladgate informed Mr. Krilivsky that he was on vacation, generally uncomfortable speaking to a party without legal representation, and that Mr. Krilivsky should send Mr. Fladgate an email. (*Fladgate Dec.*, ¶ 20)

Across April 10, 11 and 12, 2018, emails were exchanged between Mr. Krilivsky and Mr. Fladgate, that also copied in Defendant's registered agent in Delaware. In the email exchange, Mr. Krilivsky accused Mr. Fladgate and/or Plaintiff of "completely wasting the US and State's time, my time, and money," being a "bully" and "fraudulent" and that he would "spend as much money as needed to make an example out of you and your company." (Dkt. # 11-1, 7; *Fladgate Dec.*, ¶¶ 21-22)

The email exchange ended with Mr. Krilivsky stating "I expect that you'll drop this before we waste time and money filing a response as it will only increase your debt" followed by a picture, inserted by Mr. Krilivsky, of Mr. Fladgate's then 3 year old daughter featured on one of Defendant's garments. (Dkt. # 11-1) Mr. Fladgate understood this email to be a threat. (Dkt. # 11-1, 3; *Fladgate Dec.*, ¶¶ 23-28; *Feingold Dec.*, ¶¶ 21-26; *Garson Dec.*, ¶¶ 3-7)

Below is a redacted version of Mr. Krilivsky's email:



*Fladgate Dec.*, ¶ 24.

Shortly thereafter, Defendant engaged its first counsel in the matter, Andrew Gerber. (*Fladgate Dec.*, ¶ 29)

On May 22, 2018, Mr. Gerber notified Mr. Fladgate that he intended to move to dismiss the Complaint as some of the photographs referenced in the Complaint were not registered with the Copyright Office. Mr. Gerber refused to accept Mr. Fladgate's undertaking that Plaintiff would not seek damages in relation to the un-registered photographs. Rather than fight this matter before Judge Swain, Plaintiff sought, and eventually received, Defendant's permission to file an Amended Complaint, which was filed on May 31, 2018. (Dkt. # 14)

On September 19, 2018, Defendant's CEO, Mike Krilivsky aggressively sought to communicate and connect with Plaintiff and her daughter. Within a two hour period, Mr. Krilivsky (a) called Plaintiff's phone, (b) sent texts to Plaintiff's phone, (c) emailed Plaintiff, (d) followed Plaintiff on Instagram, (e) sent Plaintiff a message on Instagram, (f) requested to be connected to Plaintiff on LinkedIn, (g) sent Plaintiff a message on LinkedIn, and (h) requested to follow Plaintiff's daughter (who has a different last name to Plaintiff) on Instagram. (*Feingold Dec.*, ¶¶ 27-32, Ex. A; *Fladgate Dec.*, ¶¶ 32-33, Ex. C) We submit the foregoing constitutes harassment and was wholly unnecessary as both parties were represented by counsel and there was no pressing need for the litigants to be in direct communication at the time, particularly in light of the threats made by Krilivsky in his April 12, 2018 email to Mr. Fladgate.

On September 22, 2018, Defendant's CEO, Mike Krilivsky sent to Plaintiff and her counsel a screenshot allegedly showing when the various Vendor URLs were deleted. That document contains verifiably false information in the "deleted_at" column – specifically, that each of the Vendor URLs were deleted on January 10, 2018. (*Fladgate Dec.*, ¶¶ 34-35, Ex. D)

On September 25, 2018, Mr. Gerber filed with the Court sealed documents to withdraw as counsel. (Dkt. # 27; *Fladgate Dec.*, ¶ 36). The redacted versions of those documents were filed on the ECF system on October 17, 2018. (Dkt. # 29) To the extent that the unredacted documents

reveal Defendant's conduct or attitude – particularly in light of the close temporal proximity between Mr. Krilivsky providing the above manipulated screenshot and Mr. Gerber's withdrawal as counsel – we submit those documents should be considered and evaluated by the Court in the present matter. (*Fladgate Dec.*, ¶ 36)

Pursuant to Judge Gorenstein's order permitting Mr. Gerber to withdrew, Defendant had until November 5, 2018 to engage new counsel before Plaintiff could move for default. (Dkt. # 32) Defendant then waited until the last minute, November 3, 2018, before instructing new counsel, Matthew Heerde, to appear. (Dkt. # 35)

On or about December 27, 2018, Defendant's counsel served its discovery responses which were no more than form objections to both requests for production and in response to interrogatories. (*Fladgate Dec.*, ¶ 38) These form objections, are included within Defendant's Supplemental Responses to Interrogatories (Dkt. # 125-1), and its Supplemental Responses to Requests for Production (Dkt. # 125-29).

On January 4, 2019, Defendant's counsel also represented that all purported sales had been subsequently cancelled, and then emailed a document purporting to show such cancelled sales to Mr. Fladgate. (Dkt. # 125, ¶ 89; Dkt. # 125-25, 2, 6-8; *Fladgate Dec.*, ¶ 39, Ex. E) As discussed above, a subsequent document was produced by Defendant in discovery purporting to show the canceled sales as final sales. (Dkt. 125, ¶¶ 91-92; Dkt. 125-27; *Fladgate Dec.*, ¶¶ 40-41)

On January 8, 2019, Ms. Betty Tufariello became Defendant's third counsel in this matter. (Dkt. # 42; Dkt. # 43).

Ignoring the form objections served on December 27, 2018, Defendant did not formally respond Plaintiff's discovery of November 27, 2018, despite multiple reminders from Plaintiff's counsel, until March 29, 2019. (Dkt. # 125-1; Dkt. # 125-29) Even then, Defendant asserted that

it only possessed 20 pages of relevant document discovery – 11 of which were already in Plaintiff's possession.

c.      The Defendant's deposition

Mr. Fladgate then sought to arrange the deposition of Defendant's Rule 30(1)(b)(6) representative. His initial (and substantial) attempts are set forth in his letter to Judge Gorenstein dated May 6, 2019 (Dkt. # 51). For brevity's sake, the saga that followed, and the subsequent submissions to this Court, is set forth chronologically in the *Fladgate Dec.*, ¶¶ 43-68. In summary, however, in order to schedule a one day deposition, it took: (a) approximately 32 emails to be send by Mr. Fladgate; (b) Mr. Fladgate reviewing approximately 20 emails from Ms. Tufariello; (c) Mr. Fladgate writing to the Court on three separate occasions; (d) Ms. Tufariello making three separate submissions to the Court; (e) five separate orders of the Court; and (f) Mr. Fladgate's firm undertaking significant duplicative work. (Dkt. #110, ¶ 58; *Fladgate Dec.*, ¶ 68) Additionally, Ms. Tufariello and/or her client breached three Court orders in less than two months. (Dkt. # 110, ¶¶ 5-10)

ii.      *The conduct and attitude of Plaintiff*

Throughout the course of this matter, Plaintiff has been patient and largely tolerant of Defendant's behavior as a defendant and, again for brevity's sake, a summary of Plaintiff's conduct and attitude is set forth in the *Fladgate Dec.*, ¶¶ 76-93 and the *Feingold Dec.*, ¶¶ 35-49.

In short, Plaintiff has been close to a model litigant and taken steps at all times to preserve judicial resources, while promoting the chances of settlement.

## IV.    DAMAGES FOR WILLFUL INFRINGEMENT

Based on the foregoing, it is appropriate for the Court to determine that Defendant willfully infringed Plaintiff's copyrights within the meaning of 17 U.S.C. § 504(c)(2).

To prove willful infringement, the copyright holder must show that the infringer "'had knowledge that its conduct represented infringement or ... recklessly disregarded the possibility.'" *Id*. This Court has found willful infringement where a defendant, after receiving the plaintiff's demand to desist, continued to make sales. *See*, *HarperCollins Publrs. LLC v. Open Rd. Integrated Media, LLP*, 58 F. Supp. 3d 380, 389 (S.D.N.Y. 2014).

The copyright holder has the burden of proving willfulness, and, critically, "[t]he burden of proving innocence is on the alleged infringer." *Bryant v. Media Rights Prods*., 603 F.3d 135, 143 (2d Cir. 2010).

Where the Court finds that the infringement was committed willfully, "the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000.00." 17 U.S.C. § 504(c)(2); *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 126 (2d Cir. 2014). (Dkt. # 153, 13)

Further, on a finding of willful copyright infringement, "'courts in this Circuit typically award damages between three and five times the cost of the licensing fees the defendant would have paid.'" *Erickson Prods. v. Only Websites, Inc.*, 2015 U.S. Dist. LEXIS 177371 2015 U.S. Dist. LEXIS 177371 at *6-7 (S.D.N.Y. 2015).

Based on the above submissions in this Supplemental Memorandum, it has been established that Defendant knew it was infringing, or at least recklessly disregarded, Plaintiff's copyrights. This knowledge or reckless disregard is demonstrated by (a) Defendant taking at least 18 days to remove the Vendor URLs (Dkt. # 153, 12-13), (b) Defendant's multiple and persistent false denials

about sales being made; (c) Defendant's creation of false documents to deceitfully try to prove that (i) the Vendor URLs were removed on January 10, 2018, and (ii) two purported sales of the Madonna Photograph prior to 2018 were both cancelled.

Accordingly, Defendant acted with knowledge and/or reckless disregard to Plaintiff's rights and, in no manner whatsoever, acted innocently. Of note, Defendant has still not offered an explanation of any sort as to why it took at least 18 days to remove the Vendor URLs – it only blithely asserts that removal "within 18-23 days" is expeditious. (Dkt. # 146, 10) The same applies in relation to the supposed canceled sales.

Therefore, it is within the Court's discretion to impose a heightened amount of damages, as Defendant's conduct has been shown to constitute willful infringement, by awarding between three and five times the cost of the licensing fees defendant would have paid. While measuring and comparing various forms of misconduct is an invidious task, we submit that Defendant's behavior in this case was so egregious as to merit an award of five times the licensing fees that it should have paid to Plaintiff. As set forth above, Plaintiff would have taken no further action if Defendant honored its original representation to remove the Vendor URLs within 24 hours. (*Feingold Dec.*, ¶ 44; *Fladgate Dec.*, ¶ 88) Moreover, had Defendant been honest about sales made then, based on Plaintiff's litigation history, settlement would have been more likely. (*Feingold Dec.*, ¶ 35-44; *Fladgate Dec.*, ¶ 78-95) Instead, Defendant sought to deny, delay and fabricate. As such, it should be held appropriately accountable for such behavior.

For the foregoing reasons, we submit that Defendant should have paid a licensing fee of $30,000 for the Madonna Photograph (recognizing that it could be used by three Vendors) and $10,000 for the Reeves Photograph. Multiplied by five, that produces damages of $150,000 for the Madonna Photograph and $50,000 for the Reeves Photograph. (Dkt. # 150, ¶¶ 19, 61; Dkt. 150-1;

*Feingold Dec.*, ¶¶ 12-15, 17-20))

## V.   PLAINTIFF'S ATTORNEYS' FEES AND COSTS

Plaintiff also seeks her attorneys' fees and costs in this matter.

As noted by Court:

> Section 505 of the Copyright Act permits district courts to award of a "reasonable attorney's fee to the prevailing party" in copyright actions. 17 U.S.C. § 505. The statue provides "no precise rule or formula" for determining the appropriateness or amount of a fee award. *Fogerty v. Fantasy, Inc.* 510 U.S. 517, 534 (1994) (internal quote marks omitted). Accordingly, courts must exercise "equitable discretion." *Id.* "[S]everal nonexclusive factors" inform this exercise of discretion, including "frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985 (2016) (alteration in original) (quoting *Fogerty*, 510 U.S. at 534 n. 19). "Although objective reasonableness [of the losing party's position] carries significant weight, courts must view all the circumstances of a case on their own terms." *Kirtsaeng*, 136 S. Ct. at 1989. (Dkt. # 153, 13-14)

Additionally, the Court may determine attorneys' fees "based on a 'reasonable hourly rate,' or 'the rate a paying client would be willing to pay.'" *Tiffany & Co. v. Costco Wholesale Corp.*, 2019 U.S. Dist. LEXIS 2844 *27 (S.D.N.Y. 2019). A "reasonable rate" is further informed by "the prevailing rates 'in the community for similar services by lawyers of reasonably comparable skill[,] expertise and reputation.'" *Id.* Moreover, "[t]he Second Circuit has upheld the award of fees based on an attorney's full rate notwithstanding a discounted rate actually charged to a prevailing party, reasoning that a defendant who acted willfully . . . should not benefit from a discount negotiated between a plaintiff and its counsel." *Id.* (citing, *Getty Petroleum Corp. v. Barco Petroleum Corp.*, 858 F.2de 103, 114 (2d Cir. 1988).

As Plaintiff is the prevailing party (Dkt. # 153, 14), an award of attorney's is within the Court's discretion.

As set forth in multiple filings in this matter, Defendant was caught red-handed infringing Plaintiff's copyrights and, rather than availing itself of the safe harbor provisions of the DMCA or

being honest about the sales it had made, Defendant decided to embark upon a defense predicated on untruths, falsified documents, delays and frivolous motion practice.

First, Defendant promised to remove Vendor URLs. Because it did not do this, Plaintiff's attorneys spent time and expenses both recording the period of time the Vendor URLs remained "live" and organizing a test buy. These efforts turned out to be valuable to Plaintiff, because it was only once Defendant realized a test buy had been conducted, did it admit to making sales.

Later, Defendant disputed Plaintiff's copyright ownership of both Photographs. So, at considerable time and expense, Plaintiff instructed her attorneys to procure record copies of the deposits made at the Copyright Office for each of the Photographs. Plaintiff did not need to do this, but did so in order to promote an expeditious settlement of the matter.

Later, Defendant filed a motion for partial summary judgment and sought to stay proceedings in an effort to further stall the progress of this matter. This was despite Defendant having conducted no depositions which, given the high burden required for summary judgement, is demonstrative the frivolous nature of the motion. Unsurprisingly, both the motion and the stay were denied. However, the motion required Plaintiff's attorneys to expend significant time in order to properly respond to it.

Then, there was the saga over conducting the one day deposition of Defendant which involved Defendant and its counsel breaching three separate orders of the Court. (Dkt. #110, ¶¶ 5-10, 58; *Fladgate Dec.*, ¶¶ 45-68) The consequence, for Plaintiff, however, is that her attorneys had to engage in unnecessary correspondence with the Court and Defendant's counsel, unnecessary motion practice, and substantial duplicative work. (Dkt. #110, ¶ 58)

Accordingly, we submit, Defendant's position in this matter lacks any objective reasonableness.

In relation to the attorneys' fees sought, Plaintiff seeks:

(a)    $82,624.00 for fees incurred through to the filing of her motion for summary judgment on October 17, 2019; (Dkt. # 123 et seq.; *Fladgate Dec.*, ¶ 97(b), Ex. H)

(b)    $11,579.00 for fees incurred between the filing of her motion for summary judgment and the filing of her reply papers in relation to that motion on December 30, 2019; (Dkt. # 149 et seq.; *Fladgate Dec.*, ¶97(c))

(c)    $10,282.00 for fees incurred in the preparation of this supplemental filing (*Fladgate Dec.*, ¶¶ 99-101, Ex. I); and

(d)    $12,551.00 for fees incurred in the preparation of Plaintiff's filings concerning Judge Gorenstein's order to show cause why Defendant and its counsel should not have sanctions imposed. (Dkt. # 109; Dkt. # 110; *Fladgate Dec.*, ¶ 97(a)) For the avoidance of doubt, none of these fees have been included in any of the above amounts.

The above attorneys' fees total $116,676.00. (*Fladgate Dec.*, ¶ 117(a))

In further support of the above, Plaintiff brings to the Court's attention that (a) all billing rates fall within the rates previously permitted and applied by this district, and (b) Plaintiff's counsel has written off significant amounts of time. (*Fladgate Dec.*, ¶¶ 113-116)

Additionally, pursuant to Section 505 of the Copyright Act, the Court may, in its discretion, also award Plaintiff, as the prevailing party, her costs. Accordingly, Plaintiff seeks:

(a)    $2,893.35 in relation to costs expended through to the filing of her motion for summary judgment on October 17, 2019; (Dkt. # 123 et seq.; *Fladgate Dec.*, ¶ 98(a));

(b)    $50.67 in relation to costs expended between the filing of her motion for summary judgment and the filing of her reply papers in relation to that motion on December 30, 2019; (Dkt. # 149 et seq.; *Fladgate Dec.*, ¶ 98(b)); and

(c)     $111.75 in relation to other costs not previously claimed. (*Fladgate Dec.*, ¶¶ 109-

112, Ex. J)

The above costs total $3,055.77. (*Fladgate Dec.*, ¶ 117(b))

## VI.     CONCLUSION

Accordingly, for the foregoing reasons, Plaintiff has demonstrated an entitlement to statutory

damages based on willful infringement, her reasonable attorneys' fees, and cost, in the amounts

of:

(a)     Statutory damages for Defendant's infringement of:

(i)     The Madonna Photograph in the amount of $150,000.00;

(ii)    The Reeves Photograph in the amount of $50,000.00;

(b)     Attorneys' fees of $116,676.00;

(c)     Costs in the amount of $3,055.77.

Plaintiff respectfully requests the Court order the Defendant to pay the above amounts to

Plaintiff, plus whatever other relief the Court deems appropriate.


Dated:  New York, New York
        September 8, 2020

                              Respectfully Submitted,
                              **Garson, Ségal, Steinmetz, Fladgate LLP**
                              *Attorneys for Plaintiff*

                              By:     _____/s/_____
                                      Chris J. Fladgate (CF1999)
                                      164 West 25th Street, Suite 11R
                                      New York, NY 10001
                                      Telephone: (212) 380-3623
                                      Facsimile: (347) 537-4540
                                      Email: cf@gs2law.com