UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

DEBORAH FEINGOLD D/B/A
DEBORAH FEINGOLD PHOTOGRAPHY           Case No.: 1:18-cv-2055
                                       (KMW)(GWG)
                      Plaintiff,

   -against-                          DECLARATION OF
                                       DEBORAH FEINGOLD

RAGEON, INC., JOHN DOES 1-4,

                      Defendants.
------------------------------------------------------------x

I, Deborah Feingold, hereby declare under penalty of perjury:

1.    I am the Plaintiff in this action and am fully familiar with the facts and circumstances of this action.

2.    I make this reply declaration in support of Plaintiff's Supplemental Request for Damages, Attorneys' Fees, and Costs ("Supplemental Request"), made at the invitation of the Court. (Dkt. # 153, 14).

**Prior Declarations Concerning Plaintiff's Damages, Attorneys' Fees, and Cost**

3.    I bring to the Court's attention the following declarations that I have made in this matter concerning Plaintiff's damages, attorneys' fees, and costs:

(a)    Dkt. # 127 ("Declaration of Deborah Feingold" in support of my motion for summary judgement); and

(b)    Dkt. # 150 ("Reply Declaration of Deborah Feingold" in further support to my motion for summary judgement).

1

4.  For reasons of efficiency, each of the above references are repeated and incorporated within this declaration, unless otherwise expressed.

**The Photographs**

5.  Both the photograph of Madonna ("Madonna Photograph") and the photograph of Keanu Reeves ("Reeves Photograph" which, together with the Madonna Photograph, are collectively "Photographs") are some of my most valuable photographs.

6.  The Madonna Photograph was taken prior to Madonna obtaining any widespread fame.

7.  Moreover, the "look" of Madonna, in both the Madonna Photograph and the other published photographs from that shoot, has become an instantly recognizable identifier of Madonna continuing through to today.

8.  I note, for example, that Madonna has a similar  - but less "street" or "grunge" – look on the cover of her debut, and self-titled, album which was released in 1983. Being more raw than the album cover has also, I feel, added significant popularity, longevity and value to the Madonna Photograph because in the Madonna Photograph, Madonna has a greater sense of naiveté, while on the album she appears more stylized and "slicked-up."



2

9. As such, the value in the Madonna Photograph stems from the fact that very few photographs of Madonna exist from 1982 or earlier, it captures an authentic look from early in her career, and that it remains recognizable today.

10. Similarly, with the Reeves Photograph, which was published in Rolling Stone Magazine about the same time that he became famous for his role in *Bill & Ted's Excellent Adventure*. The Reeves Photograph has also held its value over time because, I believe, it's a less serious and more playful photograph of Mr. Reeves. I remember from the photo shoot itself – in Montauk on Long Island – that Mr. Reeves dipped his head into the bay in order to wet and slick back his hair. In retrospect, that added a lot to the Reeves Photograph by giving a certain freshness and, also, it became, as I mentioned above, a somewhat atypical photograph of Mr. Reeves.

11. As with the Madonna Photograph, there are few other photos of Mr. Reeves from around the time that the Reeves Photograph was taken and, as such, a lot of its value comes from its rareness.

**Licensing of my photographs**

12. As I have previously stated, I would not license my photographs for merchandising purposes, including to be printed on clothing or similar. (Dkt. # 127, ¶¶ 15-17)

13. When I agree to license my photographs, I do so based on what appears to me, to be fair compensation based on the use the photograph is being put to. (Dkt. # 127, ¶ 14)

14. Whether the licensee recoups its license fees or not, is not my concern. By the same token, if the licensee makes enormous profits from my photographs then, so long as the licensee complies with the license, that is also none of my concern.

15. As I have previously stated, it is difficult for me to calculate the unpaid licensing fees from Defendant because, if in the normal course of events, I would not have licensed any photographs to Defendant. (Dkt. # 127, ¶¶ 58-61)

16. That said, having no other choice, based on Defendant's use of the Madonna Photograph, I would have entered a license agreement with Defendant permitting Defendant to sub-license, or use, the Madonna Photograph to three of its vendors.

17. I would have agreed to a per license fee of $10,000, or $30,000 in total. This was explained in my earlier declaration (Dkt. # 150, ¶¶ 19, 61; Dkt. # 150-1) and is in line with other license fees I have received for a single use of my photographs.

18. I would have agreed to the same terms for the Reeves Photograph, but with only one (and not three) sublicense.

19. My photographs are my livelihood and it is very important to me that I am able control distribution and access to my photographs.

20. Accordingly, the above amounts are based on (a) the higher amounts I have licensed my photographs for in the past; (b) the fact I was not granting single use of the Photographs, but rather potentially allowing an unlimited number of sales to be made worldwide over an indefinite period of time; and (c) the fact I was, to an extent, losing control over the Photographs.

**Defendant's behavior**

21. On or about April 12, 2018, my attorney, Chris Fladgate, forwarded to me an email he had received from Defendant's CEO, Mr. Krilivsky.

22. Specifically, the email contained a photograph of Mr. Fladgate's young daughter and told Mr. Fladgate to drop the legal case or it would only "increase his debt" or words to that effect.

23. I took this email to be a threat directed at Mr. Fladgate, his family, and myself.

24. I instructed Mr. Fladgate to immediately bring the matter before the Court and the police.

25. I also told Mr. Fladgate that if he and his firm wanted to discontinue or withdraw from this matter, I understood and would not object.

26. I have repeated the above offer to Mr. Fladgate on numerous occasions since.

27. Accordingly, I became very concerned on September 19, 2018 when Mr. Krilivsky made numerous attempts to communicate with me via multiple methods, and then attempted to communicate with my daughter (who has a different last name to me).

28. In summary, over about a two hour period on September 19, 2018, Mr. Krilivsky:

    (a) called my cell phone (more than once, I believe);

    (b) sent texts to my cell phone;

    (c) emailed me;

    (d) followed me on Instagram;

    (e) sent me a message on Instagram;

    (f) requested to be connected with me on LinkedIn;

    (g) sent me a message on LinkedIn; and

    (h) requested to follow my daughter on Instagram.

29. Attached as **Exhibit A** is a collection of records I have from September 19, 2018 in relation to the above conduct.

30. I considered the above conduct, especially given its intensity, to be harassing.

5

31. Also, in light of the email sent to Mr. Fladgate in April, I was also concerned that Mr. Krilivsky was trying to threaten me and my daughter.

32. I instructed Mr. Fladgate to contact Defendant's counsel and request that all future communication between the parties be routed via counsel.

33. Since then, from time to time, Mr. Krilivsky has emailed and called me. I have ignored the calls and deleted the emails.

34. In any event, it makes me uncomfortable to see that he is trying to communicate with me directly, particularly after Mr. Fladgate has made multiple requests to Defendant's various counsels to route all communications between the parties via counsel.

**My conduct as a litigant and Mr. Fladgate's representation of me**

35. I first met Mr. Fladgate around 2013 or 2014 and he became my attorney around 2015.

36. As stated, my photographs are my livelihood, I value my photographs highly, and, in order to protect that value, I will enforce my intellectual property rights.

37. Since then, he has commenced four federal court actions on my behalf.

38. I settled three of those actions well before trial. This matter is the fourth action.

39. Mr. Fladgate has also assisted me in reaching confidential settlements prior to commencing litigation with various media organizations. These settlement have been reached subsequent to Mr. Fladgate sending cease and desist letters.

40. In other instances, Mr. Fladgate has sent cease and desist letters on my behalf, and the infringing party has promptly removed the infringing material, and I have not pursued matters any further.

41. Mr. Fladgate has also sent out numerous DMCA takedown notices on my behalf. Other

6

than this action, none have led to financial settlements, let alone the commencement of litigation.

42. I have also sent out numerous DMCA takedown notices myself, based on templates Mr. Fladgate and his firm prepared for me. None of these notices have led to financial settlements, let alone the commencement of litigation.

43. Typically, an online platform – like Amazon, eBay, or Etsy – upon receipt of a DMCA from myself or Mr. Fladgate will remove the infringing URL promptly and I move on.

44. Accordingly, if Defendant had promptly removed the Vendor URLs – like it promised to do – I would not have commenced this action.

**Costs incurred on my behalf to promote settlement**

45. In this matter, I have often instructed Mr. Fladgate to incur costs on my behalf in an effort to demonstrate to Defendant that I actually own my own photographs.

46. Incurring these costs was frustrating because, in all of the above and more generally, no one has ever disputed my ownership of my photographs.

47. Incurring these costs also came after I, and my legal counsel, spent hours going through my records to establish my ownership. None of which was satisfactory to Defendant's various counsels.

48. All the same, my experience has been that if you can demonstrate ownership and answer the questions a defendant is asking, then I am more likely to quickly settle a case.

49. As such, I was prepared to incur costs (a) obtaining an original copy of the Rolling Stone Magazine containing the Reeves Photograph, and (b) procuring record copies of the deposit copies of the Photographs from the Copyright Office.

7

Dated: Southold, New York
September 7, 2020

BY: _____
Deborah Feingold